**RANSOM, GILBERTSON, MARTIN
& RATLIFF, L.L.P.**
Jeffrey Ratliff
1500 NE Irving Street, Suite 412
Portland, Oregon 97232
Tel: 503-226-3664
OSB No.: 893422

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT
DISTRICT OF OREGON**

| | |
|---|---|
| JONATHAN GORRIE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | CASE No.: 15-2037 |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| GENERAL NUTRITION CORPORATION, JOSEPH M. FORTUNATO, MICHAEL M. NUZZO, MICHAEL G. ARCHBOLD, and TRICIA K. TOLIVAR, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Jonathan Gorrie ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding General Nutrition Corporation, ("GNC" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased the publicly traded common stock of GNC from May 2, 2013 to October 22, 2015, both dates inclusive ("Class Period"). Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein purchased GNC common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant GNC operates as a specialty retailer of health and wellness products. GNC is a Delaware corporation and headquartered at 300 Sixth Avenue, Pittsburgh, Pennsylvania. Its common stock trades on the NYSE under the ticker symbol "GNC."

8.      Defendant Joseph M. Fortunato ("Fortunato") served as the Company's Chairman, President and Chief Executive Officer at all relevant times until his departure from the Company on August 4, 2014.

9.      Defendant Michael M. Nuzzo ("Nuzzo") served as the Company's Executive Vice President & Chief Financial Officer at all relevant times until his departure from the Company on July 29, 2014.

10.     Defendant Michael G. Archbold ("Archbold") has served as the Company's Chief Executive Officer and a member of its Board since August 5, 2014.

11.     Defendant Tricia K. Tolivar ("Tolivar") has served as the Company's Executive Vice President and Chief Financial Officer since March 2, 2015

12.     Defendants referenced above in ¶¶ 8-11 are sometimes referred to herein, collectively, as the "Individual Defendants."

13.     Defendant GNC and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

3

14.    GNC is purportedly the leading global specialty retailer of health, wellness and performance products, including vitamins, minerals and herbal supplement products ("VMHS"), sports nutrition products and diet products. It has a worldwide network of more than 8,900 locations and online channels.

15.    Third-party manufacturers produce many of the products GNC sells. GNC requires its vendors to be honest, ethical, reliable and capable of providing products that meet its high standards of quality.

**Picamilon**

16.    Picamilon is a neurotransmitter (gamma-aminobutyric acid or GABA) that has been synthetically modified in order to facilitate its translocation across the blood-brain barrier. Picamilon is formed by synthetically combining nicotinic acid (niacin) with GABA. There is no indication in the literature that this compound is found in nature.

17.    Picamilon was first developed in the former Soviet Union and is currently a prescription drug in Russia used to treat a variety of neurological conditions. It has not been approved as a prescription or over-the-counter drug in the United States.

18.    A "dietary ingredient" under section 201(ff)(l) of the Federal Food, Drug, and Cosmetic Act (the "Act") is "(A) a vitamin; (B) a mineral; (C) an herb or other botanical; (D) an amino acid; (E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or (F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E)." 21 U.S.C. §32l(ff)(l).

19.    Picamilon is not a dietary ingredient under the Act. Therefore, picamilon is not a lawful dietary ingredient and products that contain picamilon may not be lawfully sold in the United States for they are not lawful dietary supplements.

## BMPEA

20.     BMPEA, known by its longer chemical name, β-methylphenethylamine, is a chemical similar to amphetamine. BMPEA is banned in competitive athletics by the World Anti-Doping Agency.

21.     BMPEA is not a dietary ingredient under the Act. Therefore, BMPEA is not a lawful dietary ingredient and products that contain BMPEA may not be lawfully sold in the United States for they are not lawful dietary supplements.

## Materially False And Misleading Statements

22.     The Class Period starts on May 2, 2013, when the Company filed its Form 10-Q for the quarter ending March 31, 2013 (the "1Q 2013 10-Q"). The 1Q 2013 10-Q was signed by Defendants Fortunato and Nuzzo. Attached to the 1Q 2013 10-Q were Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Fortunato and Nuzzo attesting to the accuracy of the 1Q 2013 10-Q.

23.     In the 1Q 2013 10-Q, the Company stated the following with regards to its disclosure controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act has been appropriately recorded, processed, summarized and reported on a timely basis and are effective in ensuring that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our CEO and CFO have concluded that, as of March 31, 2013, our disclosure controls and procedures are effective at the reasonable assurance level.

5

24.     On August 1, 2013, the Company filed its Form 10-Q for the quarter ending June

30, 2013 (the "2Q 2013 10-Q"). The 2Q 2013 10-Q was signed by Defendants Fortunato and

Nuzzo. Attached to the 2Q 2013 10-Q were SOX certifications signed by Defendants Fortunato

and Nuzzo attesting to the accuracy of the 2Q 2013 10-Q.

25.     In the 2Q 2013 10-Q, the Company stated the following with regards to its

disclosure controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer ("CEO")
and Chief Financial Officer ("CFO"), has evaluated the effectiveness of our
disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)
under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as
of the end of the period covered by this report. Disclosure controls and procedures
are designed to provide reasonable assurance that the information required to be
disclosed in the reports that we file or submit under the Exchange Act has been
appropriately recorded, processed, summarized and reported on a timely basis and
are effective in ensuring that such information is accumulated and communicated
to our management, including our CEO and CFO, as appropriate to allow timely
decisions regarding required disclosure. Based on such evaluation, our CEO and
CFO have concluded that, as of June 30, 2013, our disclosure controls and
procedures are effective at the reasonable assurance level.

26.     On October 31, 2013, the Company filed its Form 10-Q for the quarter ending

September 30, 2013 (the "3Q 2013 10-Q"). The 3Q 2013 10-Q was signed by Defendants

Fortunato and Nuzzo. Attached to the 3Q 2013 10-Q were SOX certifications signed by

Defendants Fortunato and Nuzzo attesting to the accuracy of the 3Q 2013 10-Q.

27.     In the 3Q 2013 10-Q, the Company stated the following with regards to its

disclosure controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer ("CEO")
and Chief Financial Officer ("CFO"), has evaluated the effectiveness of our
disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)
under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as

of the end of the period covered by this report. Disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act has been appropriately recorded, processed, summarized and reported on a timely basis and are effective in ensuring that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our CEO and CFO have concluded that, as of September 30, 2013, our disclosure controls and procedures are effective at the reasonable assurance level.

28.     On February 20, 2014, the Company filed its Form 10-K for the year ending

December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Fortunato and

Nuzzo. Attached to the 2013 10-K were SOX certifications signed by Defendants Fortunato and

Nuzzo attesting to the accuracy of the 2013 10-K.

29.     In the 2013 10-K, the Company stated the following with regards to its disclosure

controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report. Disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act has been appropriately recorded, processed, summarized and reported on a timely basis and are effective in ensuring that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our CEO and CFO have concluded that, as of December 31, 2013, our disclosure controls and procedures are effective at the reasonable assurance level.

30.     On February 17, 2015, the Company filed its Form 10-K for the year ending

December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Archbold.

Attached to the 2014 10-K were SOX certifications signed by Defendant Archbold attesting to

the accuracy of the 2014 10-K.

31.     In the 2014 10-K, the Company stated the following with regards to its disclosure controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer ("CEO"), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report. Disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act has been appropriately recorded, processed, summarized and reported on a timely basis and are effective in ensuring that such information is accumulated and communicated to our management, including our CEO, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our CEO has concluded that, as of December 31, 2014, our disclosure controls and procedures are effective at the reasonable assurance level.

32.     On April 30, 2015, the Company filed its Form 10-Q for the quarter ending March 31, 2015 (the "1Q 2015 10-Q"). The 1Q 2015 10-Q was signed by Defendants Archbold and Tolivar. Attached to the 1Q 2015 10-Q were SOX certifications signed by Defendants Archbold and Tolivar attesting to the accuracy of the 1Q 2015 10-Q.

33.     In the 1Q 2015 10-Q, the Company stated the following with regards to its disclosure controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed in the reports that we file or submit under the Exchange Act has been appropriately recorded, processed, summarized and reported on a timely basis and are effective in ensuring that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our CEO and CFO have concluded that, as of March 31, 2015, our disclosure controls and procedures are effective at the reasonable assurance level.

34.     On July 30, 2015, the Company filed its Form 10-Q for the quarter ending June

30, 2015 (the "2Q 2015 10-Q"). The 2Q 2015 10-Q was signed by Defendant Tolivar. Attached

to the 2Q 2015 10-Q were SOX certifications signed by Defendants Archbold and Tolivar

attesting to the accuracy of the 2Q 2015 10-Q.

35.     In the 2Q 2015 10-Q, the Company stated the following with regards to its

disclosure controls and procedures:

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer ("CEO")
and our Chief Financial Officer ("CFO"), has evaluated the effectiveness of our
disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)
under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as
of the end of the period covered by this report. Disclosure controls and procedures
are designed to provide reasonable assurance that the information required to be
disclosed in the reports that we file or submit under the Exchange Act has been
appropriately recorded, processed, summarized and reported on a timely basis and
are effective in ensuring that such information is accumulated and communicated
to our management, including our CEO and CFO, as appropriate to allow timely
decisions regarding required disclosure. Based on such evaluation, our CEO and
CFO have concluded that, as of June 30, 2015, our disclosure controls and
procedures are effective at the reasonable assurance level.

36.     The statements referenced in ¶¶ 22-35 above were materially false and/or

misleading because they misrepresented and failed to disclose the following adverse facts

pertaining to the Company's business, operations, and prospects, which were known to

Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or

misleading statements and/or failed to disclose that: (1) GNC unlawfully sold thousands of units

of products in Oregon that contained picamilon; (2) GNC unlawfully sold thousands of units of

products in Oregon that contained BMPEA; and (3) as a result of the foregoing, the Company's

public statements were materially false and misleading at all relevant times.

## The Truth Emerges

37.    On October 22, 2015, the Oregon Attorney General issued a press release announcing a lawsuit against GNC arising from GNC's sale of nutritional and dietary supplements containing the illegal ingredients picamilon and BMPEA (the "Oregon Lawsuit").

38.    The Oregon Lawsuit alleges, among other things, that:

- GNC violated the Oregon Unlawful Trade Practices Act by misrepresenting certain products that GNC sold in Oregon between January 2013 to June 2015 were lawful dietary supplements when in fact they were adulterated and unlawful because they contained either picamilon or BMPEA;

- GNC sold products in Oregon between January 2013 to May 2015 labeled as containing botanical acacia rigidula that had been spiked with unlabeled BMPEA; and

- GNC sold thousands of units of products in Oregon between January 2013 to June 2015 that contained picamilon or BMPEA that were falsely labeled as a dietary supplement.

39.    On this news, shares of GNC fell $5.73 per share or over 14% on extremely heavy volume to close as $34.50.

40.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

10

otherwise acquired GNC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GNC securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GNC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GNC;

- whether the Individual Defendants caused GNC to issue false and misleading public statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of GNC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

47.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- GNC securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold GNC securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

48.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

49.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

52.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GNC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire GNC securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

53.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GNC securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GNC's disclosure controls and procedures.

54.     By virtue of their positions at GNC, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

55.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of GNC, the Individual Defendants had knowledge of the details of GNC's internal affairs.

56.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of GNC. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GNC's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GNC securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning GNC's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired GNC securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market

for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

57.    During the Class Period, GNC securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of GNC securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of GNC securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of GNC securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

58.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**Violations of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

60.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, the Individual Defendants participated in the operation and management of GNC, and conducted and participated, directly and indirectly, in the conduct of GNC's business affairs. Because of their senior positions, they knew the adverse non-public information about GNC's operations, current financial position and future business prospects.

62.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GNC's business practices, and to correct promptly any public statements issued by GNC which had become materially false or misleading.

63.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GNC disseminated in the marketplace during the Class Period concerning the Company's disclosure controls and procedures. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GNC to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GNC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GNC securities.

64.     Each of the Individual Defendants, therefore, acted as a controlling person of GNC. By reason of their senior management positions and/or being directors of GNC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, GNC to engage in the unlawful acts and conduct complained of herein. Each of the Individual

17

Defendants exercised control over the general operations of GNC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

65.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GNC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

66.    Plaintiff hereby demands a trial by jury.

Dated: October 29, 2015                      Respectfully submitted,

                                             RANSOM, GILBERTSON, MARTIN &
                                             RATLIFF, L.L.P.

                                             By:_____
                                             Jeffrey Ratliff
                                             1500 NE Irving Street, Suite 412
                                             Portland, Oregon 97232
                                             Tel: 503-226-3664
                                             OSB No.: 893422

-and-


THE ROSEN LAW FIRM, P.A.
Laurence M. Rosen, Esq
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against GNC Holdings Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The GNC Holdings Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference. upon execution by The Rosen Law Firm P.A.

**First name:** Jonathan
**Middle initial:**
**Last name:** Gorrie
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 10/27/14 | 385 | 38.86 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below.

N/A

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:                    **YES**

**Certification for Jonathan Gorrie (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

